El Juez Presidente Señor Hernández Denton
emitió la opinión del Tribunal.
Este caso requiere que resolvamos si los tribunales pueden ordenarle a la Asamblea Legislativa que inicie el proceso para enmendar la Constitución del Estado Libre Asociado de Puerto Rico. Esto, a los fines de que la Rama Legislativa esté constituida por una sola cámara, luego de *795 que el electorado favoreció el modelo unicameral en el referéndum celebrado el 10 de julio de 2005. En específico, requiere que determinemos si puede exigierse judicialmente el mandato dispuesto en la Ley Núm. 477 de 23 de septiembre de 2004 (Ley Núm. 477), denominada Ley del Referéndum sobre el Sistema Cameral de la Asamblea Legislativa, 16 L.P.R.A. see. 971 et seq.
Para ello, debemos repasar los postulados fundamentales de nuestro sistema republicano de gobierno. Asimismo, debemos examinar el procedimiento que contempla nuestro ordenamiento constitucional para enmendar la Constitución del Estado Libre Asociado de Puerto Rico. Finalmente, nos corresponde interpretar el alcance y la validez del mandato recogido en la Ley Núm. 477 para resolver, en última instancia, la procedencia del mandamus de acuerdo con los principios discutidos.
Al examinar la referida Ley Núm. 477 a la luz del Art. VII, Sec. 1 de nuestra Constitución, L.P.R.A., Tomo 1, el cual delega en la Asamblea Legislativa la decisión de iniciar el proceso de enmienda constitucional, concluimos que ésta es contraria a dicha disposición, ya que establece un proceso de enmienda ajeno tanto a la letra como al espíritu de nuestro ordenamiento. En vista de ello, resolvemos que el mandato allí establecido resulta inoficioso y que, por ende, no se puede exigir judicialmente.
I
La Decimocuarta Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 477 para celebrar un referéndum en el Estado Libre Asociado de Puerto Rico, en el que los electores pudiesen expresar si preferían mantener una Asamblea Legislativa bicameral o cambiar a un sistema unicameral. Dicho proyecto no incluía enmiendas específicas a la Constitución, pero se dispuso que, de favorecerse un sistema unicameral, se celebraría un segundo referén *796 dum en el cual se propondrían las enmiendas constitucionales necesarias para cambiar a un sistema unicameral.
Celebrado el referéndum el 10 de julio de 2005, resultó victoriosa —con un 83.8% de los votos emitidos— la alternativa de la unicameralidad. Por lo tanto, no hay controversia en cuanto a que la mayoría del electorado que se expresó mediante dicho proceso electoral prefiere que la Asamblea Legislativa inicie el proceso para enmendar la Constitución de tal forma que dicha rama se componga de una sola cámara.
Posteriormente, y como consecuencia del resultado de la consulta, el Senado de Puerto Rico aprobó con dos terceras partes de sus miembros un proyecto de resolución en el cual se estableció una propuesta de enmienda a la Constitución con el fin de establecer el sistema unicameral. Dicho proyecto proponía enmiendas específicas a la Constitución que, de ser aprobadas por la Cámara de Representantes, serían sometidas para la consideración del electorado en una elección especial que sería celebrada posteriormente. Dicho proyecto se descargó en la Cámara de Representantes, pero no obtuvo los votos de las dos terceras partes de los miembros de esa Cámara, necesarios para su aprobación. Allí terminó cualquier intento de enmienda a nuestra Constitución.
En vista de ello, el 14 de noviembre de 2006 un grupo de ciudadanos presentó un auto de mandamus y Sentencia Declaratoria ante el Tribunal de Primera Instancia contra la Cámara de Representantes y el Senado de Puerto Rico. Solicitaron la intervención de los tribunales para poner en vigor el mandato contenido en la Ley Núm. 477 y así exigir a la Rama Legislativa que aprobara las enmiendas necesarias para hacer viable el establecimiento del sistema unicameral en Puerto Rico. Posteriormente, otro grupo de ciudadanos presentó una reclamación idéntica, por lo que ambos recursos fueron consolidados (nos referiremos a to-dos los demandantes como peticionarios).
Tanto la Cámara de Representantes como el Senado de Puerto Rico comparecieron para oponerse mediante una *797 moción de desestimación. Alegaron que el mandato recogido en la Ley Núm. 477 atenta contra nuestro sistema republicano de gobierno y la separación de poderes. Asimismo, sostuvieron que la doctrina de inmunidad parlamentaria impide que los tribunales puedan intervenir en este asunto.
Eventualmente, el Colegio de Abogados de Puerto Rico solicitó intervenir como amicus curiae, a lo que accedió el Tribunal de Primera Instancia. En su comparecencia, dicha organización argumentó que existe una obligación de la Cámara de Representantes de someter enmiendas constitucionales al pueblo.(1)
Luego de los trámites procesales de rigor, el tribunal de instancia desestimó el recurso de los peticionarios por en-tender que la controversia ante su consideración no es susceptible de revisión judicial. Concluyó que el mandato recogido en la Ley Núm. 477 no es autoejecutable, ya que depende de acciones legislativas posteriores. Por lo tanto, resolvió que el recurso de mandamus no procede en derecho para atender un asunto en el cual el legislador tiene amplio margen de discreción.
Inconformes con la Sentencia emitida por el Tribunal de Primera Instancia, los peticionarios sometieron recursos separados ante el Tribunal de Apelaciones. Dicho foro consolidó ambos recursos y autorizó al Colegio de Abogados a intervenir nuevamente como amigo de la corte. Examinadas las comparecencias de todas las partes, el Tribunal de Apelaciones confirmó la Sentencia del foro de instancia tras concluir que el proceso contemplado en la Ley Núm. 477 es contrario a lo dispuesto en la Constitución y, además, que la inmunidad parlamentaria impide a los tribunales poner en vigor el mandato recogido en la ley.
*798 De esta sentencia los peticionarios acuden ante nos mediante dos recursos separados.(2) En esencia, aducen que erró el Tribunal de Apelaciones al negarse a ordenar a la Asamblea Legislativa a que inicien el proceso de enmendar la Constitución. Sostienen que no aplica la doctrina de cuestión política ni la de inmunidad parlamentaria, por lo que erró al resolver que el asunto no era justiciable. Arguyen, además, que erró el foro intermedio al sostener que el concepto “democracia representativa” adoptado en nuestra Constitución impide que la Rama Legislativa se comprometa con el pueblo a acatar el resultado de una consulta electoral sobre el inicio de un proceso de enmienda a la Constitución del Estado Libre Asociado.(3)
Ordenamos la consolidación de las peticiones y le concedimos a todas las partes un término para exponer sus respectivas posiciones sobre la controversia de autos.(4) Cum *799 pliendo con lo ordenado, el Senado de Puerto Rico compareció el 7 de junio y la Cámara de Representantes el 11 de junio de 2007. El caso quedó sometido para su resolución el 12 de junio de 2007. Sin ulterior trámite y según lo dispuesto en la Regla 50 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A, resolvemos.
II
A. Como es sabido, en Puerto Rico se adoptó un sistema republicano de gobierno compuesto de tres poderes separados, a saber: la Rama Ejecutiva, la Rama Legislativa y la Rama Judicial. Así lo establece el Art. I, Sec. 2 de nuestra Constitución:
El gobierno del Estado Libre Asociado de Puerto Rico tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establece por esta Constitución, estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico. Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 256.
La coexistencia de estas ramas de gobierno provee un sistema de pesos y contrapesos que tiene como fin generar un equilibrio dinámico entre poderes coordinados y de igual rango y, así, evitar la concentración de poder en uno de ellos. Misión Ind. P.R. v. J.P., 146 D.P.R. 64 (1998). Asimismo, protege la libertad de los ciudadanos y evita que una de las ramas amplíe su autoridad a expensas de las otras. íd.; Acevedo Vilá v. Meléndez, 164 D.P.R. 875 (2005).
La teoría de la separación de poderes requiere que las facultades delegadas por el pueblo en la Carta Constitutiva se distribuyan entre esas tres ramas. Silva v. Hernández Agosto, 118 D.P.R. 45 (1986). Esta división tripartita conlleva una delegación constitucional de funciones. De esta forma, la Constitución no sólo proveyó un esquema de separación de poderes, sino que dispuso el ámbito de acción de cada uno.
Conforme a lo anterior, se ha desarrollado la doctrina de separación de poderes para salvaguardar la independencia *800 de cada rama de gobierno. Acevedo Vilá v. Meléndez, supra; Colón Cortés v. Pesquera, 150 D.P.R. 724 (2000). Ello resulta fundamental para nuestro esquema democrático de gobierno, por lo que no constituye una mera conveniencia o mecanismo de organización gubernamental. Véase Colón Cortés v. Pesquera, supra, citando a United Public Workers v. Mitchell, 330 U.S. 75, 91 (1947). Por consiguiente, debemos ser fieles a dicha normativa.
No obstante, conviene aclarar que la doctrina de separación de poderes no supone una separación absoluta de funciones, sino una relación dinámica y armoniosa en la que cada rama acepta y respeta la autoridad de las otras, así como la interrelación de sus funciones. íd.; Sánchez et al. v. Srio. de Justicia et al., 157 D.P.R. 360 (2002).
Como corolario de la doctrina de separación de poderes, y en aras de respetar el radio de acción de cada rama de gobierno, este Tribunal ha desarrollado una doctrina de autolimitación judicial. Al amparo de dicha doctrina, hemos establecido que la Rama Judicial no intervendrá en determinada controversia cuando: se trata de resolver una cuestión política; una de las partes no tiene capacidad jurídica para promover un pleito; después de comenzado un pleito, hechos posteriores lo convierten en académico; las partes buscan obtener una “opinión consultiva”, o se promueve un pleito que no está maduro. Noriega v. Hernández Colón, 135 D.P.R. 406 (1994).
En lo pertinente, la doctrina de cuestión política impide la revisión judicial de asuntos que fueron delegados a las otras ramas políticas del Gobierno o, en última instancia, al electorado. P.P.D. v. Gobernador II, 136 D.P.R. 916 (1994); Noriega Rodríguez v. Jarabe, 136 D.P.R. 497 (1994). Específicamente, en Noriega v. Hernández Colón, supra, pág. 422, establecimos que un asunto no es justiciable o susceptible de adjudicación judicial por plantear una cuestión política cuando: (1) éste ha sido asignado textualmente por la Constitución a otra rama del Gobierno; (2) no existan criterios de decisión susceptibles de descubrirse y *801 administrarse por los tribunales, o bien por la presencia de otros factores análogos, y (3) existen consideraciones derivadas de la prudencia.
En síntesis, la doctrina de cuestión política limita nuestra intervención judicial en asuntos que claramente son de la injerencia de las ramas políticas del Gobierno. Reiteramos que se trata de una restricción inherente a la división tripartita de nuestro sistema republicano. Acevedo Vilá v. Meléndez, supra.
Ahora bien, la Rama Judicial tiene el poder de determinar si las otras ramas del Gobierno observaron las limitaciones constitucionales y si los actos de una de éstas exceden sus poderes delegados. Silva v. Hernández Agosto, supra. Ello significa que los tribunales podemos precisar las funciones correspondientes a las distintas ramas de gobierno, pero no inmiscuirnos en ellas. En vista de ello, si las actuaciones del Poder Legislativo están en el marco constitucional y corresponden exclusivamente a sus poderes delegados, debemos ser deferentes y restringir nuestra intervención en lo que respecta a ese asunto.
Aclarado lo anterior, y a la luz de la doctrina de la cuestión política, debemos determinar únicamente a cuál de las ramas corresponde decidir si procede iniciar un proceso de enmienda a la Constitución del E.L.A.
B. Nuestra Constitución dispuso en forma detallada los mecanismos para hacer viable su modificación en el Art. VII, Const. E.L.A., L.P.R.A., Tomo 1. Por su importancia, transcribimos in extenso la Sec. 1 del referido artículo:(5)
Sec. 1. La Asamblea Legislativa podrá proponer enmiendas a esta Constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes del número total de los miembros de que se compone cada cámara. Toda propo *802 sición de enmienda se someterá a los electores capacitados en referéndum especial, pero la Asamblea Legislativa podrá, siempre que la resolución concurrente se apruebe por no me-nos de tres cuartas partes del número total de los miembros de que se compone cada cámara, disponer que el referéndum se celebre al mismo tiempo que la elección general siguiente. Cada proposición de enmienda deberá votarse separadamente y en ningún caso se podrá someter más de tres proposiciones de enmienda en un mismo referéndum. Toda enmienda contendrá sus propios términos de vigencia y formará parte de esta Constitución si es ratificada por el voto de la mayoría de los electores que voten sobre el particular. Aprobada una proposición de enmienda, deberá publicarse con tres meses de antelación, por lo menos, a la fecha del referéndum. (Énfasis suplido.) Art. VII, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 423.
Vemos, pues, que
“los padres de nuestra Constitución diseñaron un procedimiento de enmienda que: (1) requiere la aprobación de por lo menos dos terceras (2/3) partes de los miembros de cada cámara legislativa; (2) exige que la enmienda sea sometida al electorado en referéndum especial o en una elección general si lo aprueban por lo menos tres cuartas (3/4) partes del número total de los miembros de cada cámara; (3) dispone que cada proposición de enmienda deberá votarse separadamente; (4) limita el número de proposiciones de enmienda a tres (3) en un mismo referéndum; (5) establece que toda enmienda contendrá sus términos de vigencia; (6) requiere el voto afirmativo de la mayoría de los electores que voten sobre el particular, y (7) exige que la proposición de enmienda sea publicada por lo menos noventa (90) días antes del referéndum. Berríos Martínez v. Gobernador II, 137 D.P.R. 195, 212—213 (1994).
Evidentemente, mediante dicha normativa se estableció un procedimiento lo suficientemente rígido como para impartirle estabilidad a la Constitución y distinguirla de las leyes ordinarias. De esta forma, se establecieron límites explícitos al proceso de enmendar la Constitución. Recordemos que “[Z]as constituciones deben estar fuera del alcance de la pasión súbita y el juicio pasajero y, siendo tan alto el fin que ellas cumplen, el procedimiento para enmendarlas debe ser lo suficientemente difícil como para invitar al análisis sereno y cuidadoso”. (Enfasis suplido.) J. Gon *803 zález-Ortiz, Ponencia de la Unión Americana de Libertades Civiles y ante la Comisión de Gobierno y Asuntos Laborales del Senado de Puerto Rico, 6 de octubre de 2007, pág. 5.
Del proceso descrito, enfatizamos en la exigencia de que debe originarse por iniciativa de la Asamblea Legislativa. Ortiz Angleró v. Barreto Pérez, 110 D.P.R. 84 (1980), opinión concurrente emitida por el Juez Asociado Señor Negrón García. El Art. VII, Sec. 1, contiene una delegación expresa mediante la cual corresponde a la Asamblea Legislativa la facultad de decidir la propuesta de enmiendas al electorado. En otras palabras, la decisión de si se debe o no enmendar la Constitución del Estado Libre Asociado radica en la Asamblea Legislativa.
Al disponer que “la Asamblea Legislativa podrá proponer enmiendas al electorado”, inevitablemente debemos concluir que se trata de una facultad discrecional del Poder Legislativo. Por ende, la decisión de iniciar un proceso formal de enmienda a nuestra Ley Suprema recae, por mandato constitucional, exclusivamente en la Rama Legislativa.(6)
C. Ahora bien, los peticionarios plantean que, al aprobar la Constitución, el pueblo de Puerto Rico se reservó el derecho de participar en un procedimiento de consulta que le hace la Asamblea Legislativa antes de poner en vigor el procedimiento de enmienda dispuesto por el Art. VII, Sec. 1, de nuestra Constitución, supra. Además, arguyen que una vez existe un mandato electoral se activan otras dis *804 posiciones de la Constitución que obligan a los legisladores a actuar conforme el mandato expresado por el pueblo.
Tales planteamientos sugieren que la facultad de iniciar un proceso de enmienda a la Constitución no es exclusiva de la Asamblea Legislativa, sino que existe un procedimiento implícito —por iniciativa directa del electorado— para enmendar la Constitución. En esencia, de sus argumentos se desprende la posibilidad de enmendar la Constitución por iniciativa popular.(7) Sin embargo, la propia Constitución excluye este mecanismo de enmienda.
Tal como expusimos, la decisión de iniciar un proceso de enmienda a la Constitución le corresponde a la Asamblea Legislativa, según el texto del Art. VII, Sec. 1 de la Constitución, supra. Dicha disposición no establece ningún supuesto en el que el cuerpo legislativo esté obligado a comenzar un proceso de enmienda a iniciativa del electorado. Más bien, la participación ciudadana que tiene alguna injerencia en el proceso es posterior a la etapa en que la Asamblea Legislativa, efectivamente, lleva a cabo el acto de proponer enmiendas a la Constitución.
Así se desprende de nuestra Constitución en cuanto establece que u[t\oda proposición de enmienda se someterá a los electores capacitados en referéndum especial” y en cuanto dispone que “[t]oda enmienda contendrá sus propios términos de vigencia y formará parte de esta Constitución si es ratificada por el voto de la mayoría de los electores que voten sobre el particular”. (Énfasis suplido.) Art. VII, Sec. 1, Const. E.L.A., supra, ed. 1999, pág. 423.(8) En efecto, en Berrios Martínez v. Gobernador *805 II, supra, pág. 212, sostuvimos que el propósito principal de ese referéndum especial es “ ‘determinar si el cambio propuesto a la ley fundamental tiene o no respaldo del electorado’ ”. (Énfasis suplido.) Así, el ciudadano desempeña un papel importante en el trámite final de todo proceso de enmienda. La Nueva Constitución de Puerto Rico, San Juan, Ed. U.P.R., 2005, pág. 522.
Claramente, el texto de la Constitución excluye el proceso de enmienda mediante consulta directa al pueblo. Según expresamente dispuesto en el Art. VII, Sec. 1, supra, la Asamblea Legislativa primero tiene que aprobar unas enmiendas y, concluido dicho trámite, entonces se somete el texto de la enmienda a votación del electorado.
Por otro lado, del Diario de Sesiones de la Convención Constituyente se desprende que los delegados expresamente rechazaron una propuesta del delegado señor García Delgado para incorporar un proceso de enmienda por iniciativa popular. El texto propuesto y rechazado disponía que “ ‘una quinta parte o más de los votantes capacitados de Puerto Rico, podrá, mediante petición a la Asamblea Legislativa, solicitar se enmienda [sic] la [C]onstitución, estando la [Asamblea] Legislativa obligada a someter la enmienda así propuesta a un referéndum’ ”. 3 Diario de Sesiones de la Convención Constituyente 1829 (1952).
Para fundamentar dicha propuesta, el señor García Delgado sostuvo que
... se le debe garantizar [a los] ... electores del pueblo de Puerto Rico ... el poder de solicitar, por lo menos, de la Asamblea Legislativa, que la enmienda sea propuesta y sea sometida en referéndum. Si se está defendiendo en esta [C]onstitución la voluntad del pueblo, no veo cómo esa voluntad del pueblo pueda estar defendida sin un articulado en esta [C]onstitución que le permita a ese pueblo, sin intervención de segundas personas, solicitar directamente, de quien sea pertinente, que se enmiende la [C]onstitución según los deseos de ese número de votantes. Diario de Sesiones, supra, págs. 1831-1832.
Es evidente que la base de los fundamentos presentados por el delegado señor García Delgado es similar a la de los *806 peticionarios. Sin embargo, dichos fundamentos no fueron endosados por una mayoría de la Convención Constituyente y, por consiguiente, no se incorporó el texto propuesto.
En su lugar, se adoptó un mecanismo que otorga a la Asamblea Legislativa la facultad de iniciar el proceso de enmienda a la Constitución.(9) Al adoptar este procedimiento, la Convención Constituyente endosó la posición de los delegados Sres. José Trías Monge y Jaime Benitez. Este último sostuvo que
... es particularmente importante que los cuerpos parlamentarios tengan la plenitud de su encomienda y se sepa que se mira hacia ellos para desempeñar la alta responsabilidad que dentro del sistema de la democracia republicana les corresponde; y que, en mi opinión, constituiría un grave error el excluirlos o proveer una mecánica para su exclusión, en el proceso de hacer enmiendas. Diario de Sesiones, supra, pág. 1832.
De lo anterior se colige que durante los debates de la Convención Constituyente se contempló la posibilidad de establecer el mecanismo de enmienda por iniciativa popular, pero fue rechazado. Por ende, no podemos endosar la posición de los peticionarios en cuanto sostienen que, de un análisis integral de la Constitución, surge que un reclamo del electorado expresado en un referéndum tiene el efecto de obligar a los legisladores a iniciar el proceso de enmienda.
Ahora bien, conviene aclarar que la Constitución no prohíbe celebrar un referéndum antes de iniciarse el proceso contemplado en el Art. VII, Sec. 1, supra, para pal-par el sentir de la ciudadanía. Lo que contraviene la Constitución es que esa consulta tenga el efecto de obligar a la Asamblea Legislativa a iniciar dicho proceso y, por ende, a proponer determinadas enmiendas al electorado. Ello en vista de que el mecanismo contemplado en la Constitución *807 le concede discreción a la Asamblea Legislativa para iniciar el proceso de enmienda lo cual, sin duda, implica unos límites a la participación ciudadana.(10)
IV
Aclarado que el mecanismo de enmienda a la Constitución por iniciativa popular no surge del texto del Art. VII de la Constitución y que, además, fue expresamente rechazado por la Convención Constituyente, procede analizar el alcance del mandato establecido en la Ley Núm. 477, así como su validez a la luz de nuestro ordenamiento constitucional.
Los peticionarios arguyen que la Ley Núm. 477 estableció un mandato a la Asamblea Legislativa para que propusieran enmiendas al electorado. En otras palabras, arguyen que la Asamblea Legislativa estaba obligada a acatar la voluntad de la mayoría del electorado en cuanto a si se debía o no iniciar un proceso formal de enmiendas a la Constitución. Los peticionarios sostienen que en nuestro ordenamiento constitucional impera la ley y no las voluntades individuales, por lo que la Legislatura no puede negarse a obedecer el mandato que surge de esta ley. No tienen razón.
A. La Ley Núm. 477 se aprobó por la Decimocuarta Asamblea Legislativa para hacer viable la celebración de un referéndum con el fin de consultar al electorado sobre su preferencia en cuanto a mantener un “sistema bicameral” o cambiar a un “sistema unicameral” en la Asamblea Legislativa de Puerto Rico. Según surge de la Exposición de Motivos, la ley tuvo como propósito proveer los mecanismos para que se consultara en primera instan *808 cia al pueblo sobre su preferencia en cuanto a la forma como se debía ejercer el Poder Legislativo.
En lo pertinente a la controversia que nos ocupa, el Art. 3 del estatuto en controversia especificó el tipo de información que habría de incluirse en la papeleta a usarse en el referéndum. En específico, se ordenó que se incorporara la instrucción siguiente:
Un voto a favor del Número 1 [la unicameralidad] significaría un mandato a la Asamblea Legislativa para que se celebre un referéndum el nueve (9) de julio de 2007 con el fin de proponer al electorado que se enmiende la [C]onstitución del Estado Libre Asociado de Puerto Rico, de forma tal que a partir del dos (2) de enero de 2009 la Asamblea Legislativa de Puerto Rico est[é] constituida bajo una sola cámara. Significará además, que la propuesta de enm[i]enda a la Constitución del Estado Libre Asociado de Puerto Rico se presentará mediante el referéndum dispuesto en la sección 1 del artículo VII de la constitución y no por lo dispuesto en la sección 2 de dicho artículo. (Énfasis suprimido.) 16 L.P.R.A. sec. 971a.
Asimismo, en el Art. 25 de la Ley Núm. 447 (16 L.P.R.A. sec. 971t) se dispuso que si la Comisión Estatal de Elecciones certificaba que el resultado del referéndum había favorecido el sistema unicameral para la Asamblea Legislativa de Puerto Rico, se celebraría un referéndum especial para aceptar o rechazar las proposiciones constitucionales de enmienda, aprobadas por la Asamblea Legislativa mediante una resolución concurrente. Ello con el fin de que, a partir del 2 de enero de 2009, se estableciera el sistema unicameral en la Rama Legislativa.
De lo anterior se desprende que la Ley Núm. 477, promulgada por la Decimocuarta Asamblea Legislativa, estableció un mandato para que la Decimoquinta Asamblea Legislativa proponga enmiendas al electorado en un referéndum que se celebraría el 9 de julio de 2007. En otras palabras, mediante el mandato allí establecido se pretende obligar a la actual Asamblea Legislativa a iniciar un proceso formal de enmienda a la Constitución. Esto constituye un procedimiento de enmienda obligatorio por *809 iniciativa popular expresamente vedado en nuestro ordenamiento constitucional.
Como vimos, recae en la discreción de la Asamblea Legislativa el iniciar el proceso de enmienda constitucional establecido en el Art. VII, Sec. 1 de la Constitución, supra. Sin embargo, un análisis integral y minucioso de la Ley Núm. 477 nos convence de que ésta tuvo el efecto de eliminar la discreción aludida.(11) Mediante dicho estatuto, una Asamblea Legislativa anterior comprometió el voto de —al menos— dos terceras partes de futuros legisladores al establecer un mandato que necesariamente implicaba votar a favor de un proceso de enmienda. Conforme expresa la Cámara de Representantes en su comparecencia, el mandato expuesto en la Ley Núm. 477 requiere que se obligue a redactar un proyecto a favor de la unicameralidad, que se emitan informes favorables de Comisión y el voto compulsorio favorable de una tercera parte de los miembros de cada cámara. Esto último presenta, además, un problema práctico: a cuáles legisladores habría que obligar a votar a favor del proyecto.
A todas luces, la Ley Núm. 477 interfiere con una de las funciones básicas de los legisladores y contra-dice el proceso constitucional dispuesto en el Art. VII, Sec. 1 de nuestra Constitución, supra. Sobre este particular, hacemos eco de nuestras expresiones en cuanto a que “el despojo o la limitación de alguna de las funciones básicas de un parlamento socavaría la base misma de la democracia del país concernido”. Romero Barceló v. Hernández Agosto, 115 D.P.R. 368, 375-376 (1984).
Los peticionarios arguyen que los legisladores juraron fidelidad a la Constitución y a las leyes, y que por *810 eso están obligados a cumplir con el mandato dispuesto en la Ley Núm. 477. Sin embargo, aclaramos que tal fidelidad no se requiere cuando la ley en cuestión vulnera los principios y las garantías constitucionales. Debemos recordar que la Constitución es nuestra Ley Suprema y todas las demás leyes tienen que estar conforme a ésta.

En vista de lo anterior, resolvemos que la Ley Núm. 477 es incompatible con el proceso de enmienda dispuesto en el Art. VII, Sec. 1 de la Constitución del Estado Libre Asociado.

B. Por otro lado, aún si se entendiera que la Ley Núm. 477 no adolece de vicios constitucionales, este Tribunal estaría impedido de conceder el remedio solicitado, en virtud de la doctrina de inmunidad parlamentaria. Dicha doctrina emana del Art. Ill, Sec. 14 de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1999, pág. 375, el cual dispone:
Ningún miembro de la Asamblea Legislativa será arrestado mientras esté en sesión la cámara de la cual forme parte, ni durante los quince días anteriores o siguientes a cualquier sesión, excepto por traición, delito grave, o alteración a la paz; y todo miembro de la Asamblea Legislativa gozará de inmunidad parlamentaria por sus votos y expresiones en una u otra cámara o en cualquiera de sus comisiones.
En Romero Barceló v. Hernández Agosto, supra, tuvimos la oportunidad de recoger los postulados básicos de la doctrina de inmunidad parlamentaria. Estos son: (1) el propósito básico de la cláusula de inmunidad es garantizar la independencia de la Rama Legislativa y fortalecer así el sistema de la separación de poderes; (2) el ámbito de la inmunidad es extenso y cubre toda actividad legislativa legítima, lo que incluye, a lo menos, las que se desarrollan en el hemiciclo de las cámaras y en el seno de las comisiones; (3) son actividades legislativas legítimas, además de la de formular leyes, la de investigar y fiscalizar el Gobierno, la de rebatir asuntos de interés público y la de mantener informado al pueblo sobre la marcha de la cosa *811 pública; (4) los motivos que inspiren una actividad legislativa legítima no son objeto apropiado de escrutinio judicial.
De lo anterior se desprende que los legisladores gozan de amplia inmunidad parlamentaria en el ejercicio de sus funciones legislativas legítimas. Ello implica que contra un legislador no se pueden instar acciones legales por aquello que haga o exprese en el desempeño de las funciones para las cuales fue electo. Este privilegio no tendría razón de ser si un legislador tuviese que someterse al rigor de los procedimientos judiciales por el ejercicio vigoroso de sus prerrogativas legislativas. Romero Barceló v. Hernández Agosto, supra.
Cabe reiterar que para que un acto legislativo esté protegido por la inmunidad parlamentaria es necesario que se trate de una actividad legislativa legítima y que cumpla con los parámetros constitucionales. Según sostuvimos, si el acto está dentro de la esfera constitucional del poder conferido a la Rama Legislativa, la doctrina de separación de poderes impide que la Rama Judicial intervenga con la forma en que dicho poder fue ejercido. Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576 (1983); Acevedo Vilá v. Meléndez, supra.
Conforme hemos establecido, el proceso de enmendar la Constitución ha sido delegado a la Rama Legislativa del Gobierno. Por ende, no cabe duda de que la decisión de si se debe iniciar o no dicho proceso constituye un acto legislativo legítimo en nuestro sistema republicano de gobierno. De esta forma, la puesta en vigor del mandato contemplado en la Ley Núm. 477 trasciende a nuestro ámbito constitucional de poder.
Más aun, en virtud de la cláusula de inmunidad parlamentaria, los motivos que inspiraron la negativa de la Asamblea Legislativa de aprobar una resolución concurrente para proponer al pueblo las enmiendas constitucionales tampoco puede ser objeto de escrutinio judicial. Romero Barceló v. Hernández Agosto, supra. Por lo tanto, la *812 evaluación sobre la decisión de los legisladores corresponde al electorado y no a los tribunales.
V
Finalmente, examinemos la procedencia del recurso de mandamus. Recordemos que el auto de mandamus está disponible para ordenarle a una persona o a personas naturales, a una corporación o a un tribunal de inferior jerarquía, que cumplan o ejecuten un acto que forma parte de sus deberes y atribuciones. Art. 649 del Código de Enjuiciamiento Civil, 32 L.RR.A. see. 3421. Este recurso, por mandato expreso de ley, es altamente privilegiado y su expedición es discrecional. Aunque estamos facultados para expedirlo en el ejercicio de nuestra jurisdicción original, de ordinario lo hacemos con prudencia y en circunstancias meritorias. Véanse: Art. V, Sec. 5, Const. E.L.A., L.P.R.A., Tomo 1; Art. 3.002(a) de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003 (4 L.P.R.A. sec. 24s(a)); Art. 650 del Código de Enjuiciamiento Civil, 32 L.P.R.A. see. 3422.
La procedencia del mandamus depende inexorablemente del carácter del acto que se pretende compeler mediante dicho recurso. Acevedo Vilá v. Aponte Hernández, 168 D.P.R. 443 (2006). Sólo debe expedirse cuando la persona a quien va dirigido esté “obligada al cumplimiento de un acto que la ley particularmente ordene como un deber resultante de un empleo, cargo o función pública”. 32 L.P.R.A. sec. 3422. Es decir, el mandamus sólo procede para ordenar el cumplimiento de un deber ministerial que no admite discreción en su ejercicio, cuando no hay otro mecanismo en ley para conseguir dicho remedio. Báez Galib y otros v. C.E.E. II, 152 D.P.R. 382 (2000).
Según lo anterior, hemos resuelto que cuando se nos solicita un mandamus contra un miembro de la Asamblea Legislativa debemos evaluar la naturaleza de la función que se pretende compeler. Acevedo Vilá v. Aponte Her *813 nández, supra. De tratarse de alguna actividad legislativa legítima, no procedería el auto de mandamus en virtud de la protección que confiere la inmunidad parlamentaria. Id. En vista de que, en el caso de autos, los peticionarios pretenden que ordenemos la ejecución de un acto relacionado con el proceso deliberativo y de votación inherente a las funciones parlamentarias, evidentemente se trata de un acto legislativo legítimo.
Los peticionarios nos solicitan que le ordenemos a la Asamblea Legislativa que apruebe unas enmiendas para cambiar la composición de la Rama Legislativa según el resultado del Referéndum celebrado el 10 de julio de 2005. En esencia, nos solicitan que intervengamos con un asunto que es claramente de la injerencia del Poder Legislativo, según lo dispuesto en el Art. VII, Sec. 1, de la Constitución del Estado Libre Asociado de Puerto Rico, supra. En otras palabras, se trata de una facultad discrecional de la Asamblea Legislativa y no de un deber ministerial exigible judicialmente. Por consiguiente, el mandamus solicitado por los peticionarios es constitucionalmente improcedente.
VI
A modo de epílogo, conocemos que una mayoría del electorado puertorriqueño se expresó a favor de que la Legislatura propusiera enmiendas para que se adoptara un modelo unicameral. Sin embargo, nuestro ordenamiento constitucional nos impide ordenarles a los miembros de cualquiera de los cuerpos que legislen de tal forma que se inicie el proceso de enmienda a la Constitución dispuesto en el citado Art. VII. El mandato establecido en la ley bajo análisis es contrario a nuestra Ley Suprema. Como garantes del ordenamiento constitucional, tenemos la ineludible obligación de asegurar que cualquier proceso de enmienda constitucional cumpla con lo dispuesto en nuestra Constitución. Esa es, en última instancia, nuestra responsabilidad.
Conforme a lo anterior, es en el foro político y por medio *814 de las urnas que los peticionarios deben requerir que se les rindan las cuentas correspondientes. Cualquier otra decisión de nuestra parte sería contraria al sistema republicano de gobierno y a la Constitución que hemos jurado defender.
VII
Por los fundamentos antes expuestos, se expide el auto y se confirma la Sentencia del Tribunal de Apelaciones y, por consiguiente, la del Tribunal de Primera Instancia en cuanto desestimaron el recurso instado por los peticionarios.

Se dictará la sentencia correspondiente.

El Juez Asociado Señor Fuster Berlingeri y la Juez Asociada Señora Rodríguez Rodríguez emitieron sendas opiniones de conformidad. El Juez Asociado Señor Rebollo López emitió una opinión disidente.
Opinión de conformidad emitida por el
Juez Asociado Señor Fuster Berlingeri.
I
Coincido con el dictamen mayoritario en que este caso presenta esencialmente asuntos que la doctrina de cuestión política nos impide resolver. Deseo, sin embargo, añadir algunas consideraciones sobre el particular, adicionales a las formuladas en la opinión de la mayoría del Tribunal, para que quede claro por qué no podemos intervenir aquí.
Como se sabe, una de las doctrinas más importantes y autóctonas del derecho constitucional norteamericano es la de la cuestión política. Amparado en dicha doctrina, el Tribunal Supremo de Estados Unidos ha resuelto algunos de *815 los casos más importantes en su historia, casos famosos bien conocidos para los juristas especialistas en derecho constitucional. En esencia, conforme a dicha doctrina, los tribunales están impedidos de inmiscuirse en aquellos asuntos que la Constitución ha encomendado específicamente a las otras ramas del gobierno, las llamadas ramas políticas. Es decir, no son susceptibles de determinación judicial aquellas cuestiones que le competen propiamente a la Legislatura o al Ejecutivo.
Como bien se señala en la propia opinión de la mayoría del Tribunal, la doctrina de la cuestión política es una limitación a la función judicial que emana de otra normativa más general, que es la relativa a la separación de poderes. Se procura, pues, guardar la esfera de autoridad de cada una de las tres ramas de gobierno.
La doctrina de la cuestión política ha sido discutida ampliamente por este Tribunal en ocasiones anteriores. Lo hicimos así en Santa Aponte v. Srio. del Senado, 105 D.P.R. 750 (1977); luego otra vez en Silva v. Hernández Agosto, 118 D.P.R. 45 (1986), y más recientemente en Noriega v. Hernández Colón, 135 D.P.R. 406 (1994). Se trata de una doctrina muy reiterada por este Foro, siendo las tres decisiones mencionadas antes nuestros pronunciamientos más importantes sobre el particular, pero ciertamente no los únicos. Aunque no hemos utilizado dicha doctrina antes en la forma que el Tribunal Supremo de Estados Unidos lo ha hecho en casos notables, no cabe duda de que la hemos adoptado en nuestro haber jurisprudencial.
En el caso de autos, aplica medularmente la doctrina de la cuestión política. El asunto de hacer viable el establecimiento de un sistema legislativo unicameral en Puerto Rico sólo le compete indudablemente a las ramas políticas del Gobierno. Es cierto que la inmensa mayoría de los electores que participaron en el referéndum sobre el sistema unicameral celebrado el 10 de julio de 2005 votó a favor de dicho sistema. Ese voto claramente representa un mandato imperioso a las cámaras legislativas que las obliga moral y políticamente a actuar en conformidad con el resultado *816 electoral. No obstante, la doctrina reseñada antes, corolario de la separación de poderes, impide que este Tribunal tome cartas en el asunto. No podemos inmiscuirnos para hacer valer el mandato electoral sobre la unicameralidad sencillamente porque carecemos de la autoridad para resolver la generalidad de los asuntos implícitos en hacer valer dicho mandato. La doctrina de la cuestión política nos prohíbe asumir jurisdicción aquí. Veamos concretamente por qué ello es así.
La solicitud de mandamus que aquí nos concierne procura que ordenemos a la Asamblea Legislativa que apruebe los proyectos que sean necesarios para celebrar un referéndum dirigido a enmendar la Constitución del Estado Libre Asociado de Puerto Rico de manera que se establezca un sistema legislativo unicameral. Los peticionarios han solicitado que le ordenemos a los legisladores, en primer lugar, a poner en marcha un proceso de enmienda a la Constitución, independientemente de lo que dichos legisladores ahora piensen sobre el particular. Por ejemplo, es conocido que algunos de estos legisladores creen que el resultado del referéndum sobre la unicameralidad no constituye un mandato vinculante. Ello, por la escasa participación del electorado en el referéndum referido el 10 de julio de 2005. Se trata del referéndum menos concurrido de los últimos veinte años. Según los legisladores aludidos, la escasa participación del electorado permite cuestionar si existe un mandato claro y obligatorio del Pueblo de Puerto Rico a favor de la unicameralidad.
En sus méritos, la postura de los legisladores aludidos es claramente debatible. Pero, precisamente, la cuestión es si le corresponde a este Tribunal dilucidar esa controversia jurídicamente. Conforme a la doctrina de cuestión política, no es asunto nuestro dilucidar si la participación electoral en el referéndum aludido constituye o no una expresión adecuada del parecer del Pueblo de Puerto Rico respecto a la unicameralidad. Ello es claramente un asunto que no nos compete decidir.
*817 Más aun, la labor de establecer un sistema unicameral requiere necesariamente atender numerosos asuntos afines, que claramente son sólo de la injerencia de las ramas políticas del Gobierno: (1) ¿Cuántos escaños debe tener la cámara legislativa única? ¿Deben ser veintisiete como en el Senado actual o cincuenta y uno como en la Cámara de Representantes actual? (2) ¿Cuál será la proporción entre los miembros electos por distritos representativos en relación con los electos por acumulación? ¿Cuántos habrá de unos y de otros? (3) ¿Cuándo comenzará a operar el nuevo sistema unicameral? (4) ¿Cómo estará constituida la representación garantizada de partidos de minoría? (5) ¿Qué requisitos de edad mínima tendrán los miembros de la cámara única: veinticinco años como los representantes actuales o treinta años como los senadores actuales? Estos asuntos y otros deben ser atendidos propiamente por las ramas políticas del Gobierno y el electorado. No corresponden de modo alguno a la discreción judicial.
En resumen, pues, asuntos importantes de distinta índole deben ser decididos sólo por las otras dos ramas del Gobierno y el electorado como parte de la ingente gestión de implantar un sistema unicameral. Ello hace patente la aplicación aquí de la doctrina de la cuestión política. Por eso, por más legítima que sea la controversia que plantean los peticionarios, no tiene jurisdicción este Tribunal para atenderla. No debe cederse a la tentación de intervenir aquí para fijarle supuestas obligaciones legales a la Asamblea Legislativa.
Opinión de conformidad emitida por la
Juez Asociada Señora Rodríguez Rodríguez.
Aquí, una mayoría del Tribunal resuelve que es inexigible judicialmente y que es inconstitucional el mandato contenido en la Ley Núm. 477 de 23 de septiembre de 2004, conocida como la Ley del Referéndum sobre el Sistema Ca *818 meral de la Asamblea Legislativa (Ley Núm. 447), 16 L.P.R.A. see. 971 et seq., el cual pretende obligar a la Decimoquinta Asamblea Legislativa del Estado Libre Asociado a iniciar un proceso para enmendar la Constitución de Puerto Rico. Estoy conforme con la opinión mayoritaria puesto que la decisión discrecional de enmendar la Constitución le corresponde exclusivamente a la Asamblea Legislativa. Empero, debo puntualizar varios aspectos de esta controversia que merecen especial atención de esta Curia.
En esencia, la Mayoría apuntala su decisión en el hecho de que la Constitución del Estado Libre Asociado de Puerto Rico delega expresamente en la Asamblea Legislativa la facultad de iniciar el procedimiento de enmiendas a la Constitución y no contempla la posibilidad de que los ciudadanos obliguen a la Asamblea Legislativa a presentar propuestas de enmiendas a la Constitución. Aun cuando sustantivamente lo indicado por la Mayoría en su opinión es correcto, a mi juicio, es menester aclarar que, como cuestión de umbral, hay que examinar necesariamente los efectos jurídicos del referéndum que la Ley Núm. 477 autorizó y la facultad de una Asamblea Legislativa de obligar a sus sucesoras a proponer enmiendas a la Constitución.
Dos argumentos principales demuestran que el mandato establecido en la Ley Núm. 477 para que la Asamblea Legislativa inicie un procedimiento de enmiendas a la Constitución carece de efectos jurídicos y, por ende, es judicialmente inexigible. En primer término, la Ley Núm. 477 no convocó un referéndum para ratificar una enmienda a la Constitución, más bien ordenó la celebración de un referéndum consultivo que, por su propia naturaleza, no puede obligar a la Asamblea Legislativa a enmendar la Constitución. En segundo término, es inválido un mandato legislativo que comprometa los votos de una Asamblea Legislativa posterior y pretenda obligar a sus miembros a aprobar cierta legislación. Pueblo v. Tribunal de Distrito, 70 D.P.R. 678, 681 (1949). Veamos.
*819 I
Como es sabido, “[e]l referéndum es el método por el cual el voto de los ciudadanos determina si una propuesta legislativa o constitucional debe aprobarse”.(1) La Nueva Constitución de Puerto Rico, San Juan, Ed. U.P.R., 2005, pág. 439. “[E]s la votación encaminada a expresar el asentimiento o disentimiento del cuerpo electoral ... a una propuesta de resolución de un órgano del poder.” L. Sánchez Agesta, Principios de Teoría Política, 5ta ed., Madrid, Ed. Nacional, 1974, pág. 289.
Los contornos de esta figura de carácter multiforme se determinan por diversos criterios tales como: la materia sobre la que dicha consulta versa, su eficacia normativa, la necesidad de la intervención popular y el alcance o grado de obligatoriedad de dicho mecanismo de consulta. Véanse: N. Bobbio y N. Matteucci, Diccionario de Política, México, Ed. Siglo XXI, 1982, Vol. II, pág. 1394; Sánchez Agesta, op. cit.; L. López Guerra, Introducción al Derecho Constitucional, Valencia, Ed. Tirant Lo Blanch, 1994, págs. 135-136.
El referéndum puede ser de carácter legal o constitucional, dependiendo de la naturaleza de la resolución que se aprueba; obligatorio o facultativo, dependiendo de si la celebración de dicha consulta es un acto necesario para la validez de la resolución o si su aplicación depende de la aprobación del órgano que propone la resolución o de una petición de los electores;(2) consultivo, si recae sobre una propuesta no articulada, y de ratificación, si su objeto es una resolución definitiva que sólo aguarda la sanción de los electores. Sánchez Agesta, op. cit., pág. 290. Véase, ade *820 más, Gierbolini Rodríguez v. Gobernador, 129 D.P.R. 402, 415 (1991), opinión disidente del Juez Asociado Señor Negrón García.
En virtud de lo anterior, los efectos jurídicos de un referéndum se deben estudiar a la luz de la legislación que lo convoca, del tipo de propuesta que se presenta al electorado y del propósito que dicha consulta persigue. La diferenciación entre referéndum consultivo y de ratificación es particularmente relevante, pues demuestra que la participación del elector en este tipo de consulta no obsta a que dicho referéndum carezca de efecto jurídico vinculante en el órgano estatal que lo convoca. Su obligatoriedad depende entonces de la naturaleza de la consulta y del estatuto que la crea.
Como vimos, existe un tipo de referéndum que “produce efectos jurídicos inmediatos sin necesidad de mediación alguna por parte de otro órgano”, mientras que, por otro lado, existe un referéndum consultivo “cuyos resultados pueden permitir un cierto margen de apreciación ... en la determinación de los efectos que políticamente se derivan del resultado”. Diccionario Jurídico Espasa, Madrid, Ed. Espasa, 2005, pág. 1240. Podemos identificar entonces un tipo de referéndum vinculante en el cual “la voluntad popular ... obliga como decisión jerárquicamente superior a cualquier otra” y un tipo de referéndum consultivo en que “el resultado de la 'consulta’ popular sería un dato más, pero no el único, a tener en cuenta a la hora de adoptar la decisión final”.(3) López Guerra, op. cit., pág. 136.
*821 En nuestro ordenamiento constitucional, el referéndum es el vehículo adecuado para enmendar la Constitución. El Art. VII, Sec. 1 de la Constitución del Estado Libre Asociado de Puerto Rico, supra, dispone el procedimiento que la Asamblea Legislativa debe seguir para proponer enmiendas a la Constitución mediante un referéndum. Dicho artículo dispone:
La Asamblea Legislativa podrá proponer enmiendas a esta Constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes del número total de los miembros de que se compone cada cámara. Toda proposición de enmienda se someterá a los electores capacitados en referéndum especial, pero la Asamblea Legislativa podrá, siempre que la resolución concurrente se apruebe por no menos de tres cuartas partes del número total de los miembros de que se compone cada cámara, disponer que el referéndum se celebre al mismo tiempo que la elección general siguiente. Cada proposición de enmienda deberá votarse separadamente y en ningún caso se podrá someter más de tres proposiciones de enmienda en un mismo referéndum. Toda enmienda contendrá sus propios términos de vigencia y formará parte de esta Constitución si es ratificada por el voto de la mayoría de los electores que voten sobre el particular. Aprobada una proposición de enmienda, deberá publicarse con tres meses de antelación, por lo menos, a la fecha del referéndum.(4) Art. VII, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 422.
Como se observa, el artículo trascrito adopta un referéndum de carácter obligatorio y de ratificación (o vinculante). Este procedimiento especial garantiza que la enmienda propuesta “está en efecto respaldada por el consenso que ... representa la aquiescencia general al cambio propuesto”. La Nueva Constitución de Puerto Rico, op. cit., pág. 521. En este proceso es indispensable que el pueblo ratifique la enmienda. Luego de ratificada, ésta formará parte de la *822 Constitución sin necesidad de ulterior actuación legislativa.
Con este marco doctrinal como norte, un análisis de las características del referéndum celebrado el 10 de julio de 2005 en virtud de la Ley Núm. 477 demuestra que éste fue un referéndum de carácter consultivo y que no reunió los requisitos que el Art. VII, Sec. 1 de nuestra Constitución exige para enmendarla.
En primer término, la Ley Núm. 477 aprobó un referéndum para que el Pueblo de Puerto Rico expresara si favorecía cambiar la Asamblea Legislativa a una sola cámara o si favorecía mantener la Asamblea Legislativa compuesta por dos cámaras.(5) Véase el Art. 3 de la Ley Núm. 477 (16 L.P.R.A. sec. 971(a)). Según la Exposición de Motivos de la Ley Núm. 477, el propósito del referéndum que se celebró el 10 de julio de 2005 fue consultar “al Pueblo sobre su preferencia en cuanto a cómo se ejerce el Poder Legislativo” en nuestro país. Exposición de Motivos de la Ley Núm. 477 de 23 de septiembre de 2004 (2004 (Parte 3) Leyes de Puerto Rico 3123, 3128). De resultar victoriosa la opción de la unicameralidad para Puerto Rico, “ello constituiría una mandato a la Asamblea Legislativa para que celebre un referéndum especial proponiendo al Pueblo, ... las enmiendas constitucionales necesarias para establecer un Sistema Unicameral [en Puerto Rico]”. Id. Por lo tanto, surge con perfecta claridad de la Exposición de Motivos de la Ley Núm. 477 que dicho estatuto sólo autorizó un referéndum consultivo para auscultar el sentir del electorado puertorriqueño en torno a la posibilidad de iniciar un procedimiento de enmienda a nuestra Constitución.
En segundo término, a poco que examinemos el texto de la Ley Núm. 477 podemos colegir que dicho estatuto no contiene pauta alguna sobre los términos y la vigencia de una enmienda a la Constitución. Por el contrario, se limita a disponer los contornos procesales de la consulta sobre la *823 unicameralidad y provee el financiamiento necesario para celebrarla. Finalmente, el proyecto que le dio vida a la Ley Núm. 477 —P. del S. 2672— no cumplió con las exigencias del Art. VII, Sec. 1 de la Constitución, supra, para aprobar un referéndum constitucional, ya que no se aprobó mediante el voto de dos terceras partes del número total de los miembros de que se compone cada cámara.(6)
En fin, el propio texto de la Ley Núm. 477 y el proceso que culminó en su aprobación revelan que dicho estatuto no aprobó un referéndum para enmendar la Constitución.(7) Por lo tanto, el propósito de la consulta celebrada el 10 de julio de 2005 no fue permitir, como dispone nuestra Constitución, que el electorado puertorriqueño ratificara una enmienda a nuestra Constitución. Es decir, dicho referéndum fue de carácter consultivo y sus efectos jurídicos dependerán de que la Asamblea Legislativa inicie, dentro de su discreción, un proceso de enmienda a la Constitución. Como corolario de esto, es menester concluir que, por su propia naturaleza, dicho referéndum no vincula jurídicamente a futuras Asambleas Legislativas.
No estando en controversia que la Ley Núm. 477 convocó un referéndum consultivo con el propósito de obtener la opinión del Pueblo de Puerto Rico sobre la unicameralidad, sólo resta examinar si la Decimocuarta Asamblea Legislativa del Estado Libre Asociado de Puerto Rico podía, mediante la aprobación de la Ley Núm. 477, obligar a la Decimoquinta Asamblea Legislativa (o a los legisladores) a *824 aprobar un referéndum para proponer enmiendas a la Constitución y establecer una Asamblea Legislativa unicameral.
II
En el pasado hemos indicado que “una legislatura no puede restringir o limitar su poder ni el de futuras legislaturas para aprobar, enmendar o derogar leyes”. Pueblo v. Tribunal de Distrito, supra, pág. 681. Véanse, además: Gierbolini Rodríguez v. Gobernador, supra, pág. 426, opinión disidente del Juez Asociado Señor Negrón García; United States v. Winstar Corp., 518 U.S. 839, 872—874 (1996); Reichelderfer v. Quinn., 287 U.S. 315, 318 (1931); Stone v. Mississippi, 101 U.S. 814, 819-820 (1880); Fletcher v. Peck, 10 U.S. 87, 6 Cranch 87 (1810) (“one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature”, énfasis nuestro).(8)
Según este principio, cada legislatura tiene el mismo poder que la anterior de tomar decisiones de política pública sobre la sabiduría y conveniencia de legislar en determinada materia o de votar a favor de un proyecto de ley.(9) *825 Ello, en virtud de su facultad constitucional de proponer, estudiar y aprobar leyes. Art. II, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1.
Del mismo modo, como bien señala la opinión mayoritaria, cada Asamblea Legislativa goza de discreción para iniciar un procedimiento de enmienda a la Constitución y so-meter una propuesta de enmienda a la consideración de los electores capaces mediante referéndum. Esta discreción no puede limitarse mediante un mandato legislativo previo. En otras palabras, una legislatura no tiene la facultad de compeler a otra a iniciar un proceso de enmienda a la Constitución.
Según lo anterior, resulta ineludible concluir que el mandato de la Ley Núm. 477 carece de fuerza vinculante sobre la Decimoquinta Asamblea Legislativa y es judicialmente inexigible. Al indicar que un resultado favorable a la unicameralidad implicaría un mandato a la próxima Asamblea Legislativa para iniciar un proceso de enmienda a la Constitución, la Ley Núm. 477 le impuso una traba inconstitucional a la Decimoquinta Asamblea Legislativa. Como intérpretes de la Constitución, no podemos conferirle efecto jurídico alguno a dicho mandato. La Decimocuarta Asamblea Legislativa tomó una decisión de política pública al ordenar la celebración de un referéndum consultivo sobre la unicameralidad. Más sin embargo, esta decisión no puede comprometer el criterio o el voto de Asambleas Legislativas futuras. Tampoco puede obligarlas a proponer enmiendas a la Constitución para establecer una Rama Legislativa unicameral.
III
A modo de conclusión, debo puntualizar lo siguiente. Nada en nuestro ordenamiento o en nuestra Constitución le impedía a la Decimocuarta Asamblea Legislativa convocar un referéndum, en el cual los electores puertorriqueños podrían expresar su sentir sobre el sistema legislativo que favorecen. Ahora bien, al evaluar desapasionadamente la *826 naturaleza jurídica del proceso autorizado por la Ley Núm. 477 es evidente que su carácter consultivo no tiene el alcance de obligar a la Asamblea Legislativa a proponer enmiendas a nuestra Constitución para instaurar la unicameralidad, como se pretende. Es decir, jurídicamente, el referéndum legislado fue sólo una consulta para palpar el sentir del electorado sobre un tema de trascendencia, sin mayor consecuencia.
No obstante, este carácter consultivo no implica que el resultado del referéndum celebrado el 10 de julio esté huérfano de efecto alguno en nuestras ramas representativas de gobierno. Este efecto se reserva al ámbito político, por lo que a fin de cuentas y como siempre ocurre en una democracia, es a través del ejercicio del voto que los electores expresan su sentir sobre los distintos asuntos que se discuten a diario en la vida política puertorriqueña.

 En su comparecencia, el Colegio de Abogados de Puerto Rico plantea que el Art. VII, Sec. 1, de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, no agota las formas posibles de enmendar la Constitución. Por otro lado, sostiene que una vez se somete un asunto mediante referéndum al voto directo del pueblo y prevalece cierta opción, las cámaras legislativas están obligadas por ese resultado y están obligadas a actuar en conformidad con éste.

 El primer recurso fue presentado el 2 de mayo de 2007. Dos días después, el 4 de mayo de 2007, se presentó el otro recurso.

 En específico, en el recurso CC-2007-361 se planteó la comisión de los errores siguientes:
“Erró el Tribunal de Apelaciones al resolver que la Constitución de E.L.A. al adoptar el concepto de democracia representativa impide que la Asamblea Legislativa consulte al Pueblo sobre su deseo de iniciar un procedimiento de enmienda constitucional en virtud del artículo VII, sección I de la Constitución. Así también que en la ley que promueve la consulta se pueda legislar un mandato donde el poder legislativo se comprometa con el Pueblo a acatar el resultado electoral.
“Erró el Tribunal de Apelaciones al resolver que la inmunidad Parlamentaria prohíbe que los legisladores sean judicialmente sancionados mediante un recurso de desacato por no cumplir con un mandato electoral validamente emitido en las urnas por el pueblo de Puerto Rico. Al así resolver niega el recurso de Mandamus, que es el único remedio judicial disponible para los demandantes.” Oposición a escrito de certiorari, caso Núm. CC-07-361, págs. 6-7.
De otra parte, los peticionarios que comparecieron en el recurso Núm. CC-2007-350 sostuvieron lo siguiente:
“Erró el Tribunal de Apelaciones al confirmar la sentencia dictada por el Tribunal de Primera Instancia quien desestimó la demanda del presente caso basándose en que el asunto planteado no era justiciable por ser una cuestión política.
“Incurrió en grave error de derecho el Tribunal de Apelaciones al negarse a validar el resultado electoral del referéndum del 10 de julio de 2005 y resolver que la inmunidad parlamentaria invocada por los demandados estaba por encima de la soberanía del pueblo y del mandato popular expresado mediante sufragio universal de la ciudadanía.” Solicitud de certiorari, caso Núm. CC-07-350, pág. 6.

 El 18 de mayo de 2007 emitimos una resolución en la que concedimos treinta días a las partes para que presentaran sus alegatos. Posteriormente, el 5 de junio de 2007 modificamos ese término y les concedimos hasta el 11 de junio de 2007 para comparecer.

 Concentramos nuestro análisis en el proceso dispuesto en la Sec. 1 del Art. VII, ya que fue el mecanismo presentado en la Ley Núm. 477 de 23 de septiembre de 2004 (Ley Núm. 447), Ley del Referéndum sobre el Sistema Cameral de la Asamblea Legislativa, 16 L.P.R.A. sec. 971 et seq.

 La experiencia norteamericana ha sido la misma. En Coleman v. Miller, 307 U.S. 433 (1939), se dijo que el Congreso tiene un poder exclusivo sobre el proceso de enmienda a la Constitución de Estados Unidos. En particular, se resolvió que dicho proceso presenta condiciones que lo hacen propio para la consideración por las ramas políticas del Gobierno, por lo que se trata de un asunto no justiciable.
Asimismo, hay consenso en la doctrina en cuanto a que el proceso de enmienda a la Constitución radica en el ámbito de poder de la Rama Legislativa. Así, por ejemplo, se ha expresado lo siguiente: “Constitutional amendment is a political, not legal, process, and judicial supervision of that process threatens to undermine the independence of Art. V from normal legal processes—and poses particular problems when the amendment at issue is one proposed in response to judicial decisions. (Énfasis suplido.) L.H. Tribe, American Constitutional Law, Nueva York, Ed. Fundation Press, 2000, Vol. I, pág. 105.

 Los tres métodos más corrientes de iniciar enmiendas constitucionales son: por propuesta de la Legislatura, por convención constitucional y por iniciativa popular. Como veremos, los redactores de La Nueva Constitución de Puerto Rico sugirieron adoptar los dos primeros métodos toda vez que entendían que el tercero no era recomendable. La Nueva Constitución de Puerto Rico, San Juan, Ed. U.P.R., 2005, pág. 522.

 Al indagar sobre la definición de “ratificar” encontramos que se refiere al acto de “aprobar o confirmar actuaciones, palabras, opiniones, decisiones, decretos y reglamentos, dándolos por legales, valederos y ciertos”. I. Rivera García, Diccionario de Términos Jurídicos, 3ra ed. rev., Virginia, Lex Publishing, 2000, pág. 217.

 Tal proceder guarda armonía con la opinión de muchos de los autores de las constituciones estaduales quienes, desde 1919, llegaron a la conclusión de que la iniciación de enmiendas constitucionales debe dejarse a la discreción de la Legislatura. La Nueva Constitución de Puerto Rico, op. cit., pág. 522.

 La participación del pueblo a través del derecho al voto no es absoluta. Toda expresión del electorado está sujeta a las restricciones contenidas en la Constitución. P.A.C. v. P.I.P., 169 D.P.R. 775 (2007). Véase, además, United States v. Classic, 313 U.S. 299 (1941).

 Cabe mencionar que la Ley Núm. 477 también estableció un mandato a la inversa. Dispuso que, en caso de que el electorado votara a favor de la bicameralidad, sería un mandato a la Asamblea Legislativa para que mantenga a la Rama Legislativa de dos cámaras. En tal caso se hubiese coartado la facultad de la Asamblea Legislativa de comenzar un proceso de enmienda. Si interpretamos la ley como sugieren los peticionarios y sostenemos su validez, la Asamblea Legislativa estaría imposibilitada de proponer enmiendas al electorado en cuanto a este asunto.

 La Ley Electoral de Puerto Rico define indistintamente los términos “referéndum” y “plebiscito”, e indica que ambos constituyen el “procedimiento mediante el cual se somete al electorado del Estado Libre Asociado de Puerto Rico la aprobación o rechazo de uno o varios asuntos de interés general”. 16 L.P.R.A. sec. 3003(51).

 En el caso del referéndum facultativo, la decisión que se somete al electorado también se podría adoptar sin recurrir a dicho proceso de consulta. L. López Guerra, Introducción al Derecho Constitucional, Valencia, Ed. Tirant Lo Blanc, 1994, pág. 135.

 Esto no implica que “la voluntad democrática pueda ser simplemente ignorada”. López Guerra, op. cit., pág. 136. Sin embargo, no puede obligarse al organismo estatal que convocó la consulta a actuar en contra de sus propios criterios o de la voluntad de sus miembros quienes en última instancia tienen la responsabilidad constitucional de decidir si traducen en ley la opinión del electorado expresada en el referéndum. íd. En forma análoga, y a modo de ejemplo, el Art. 92.1 de la Constitución española dispone que “[ljas decisiones políticas de especial trascendencia podrán ser sometidas a referéndum consultivo de todos los ciudadanos”. Art. 92.1, Const. Esp. En su estudio sobre dicha disposición constitucional, el comentarista Pérez Royo indica que “la decisión [que resulte de dicha consulta] carecerá de efectos jurídicos directos”. J. Pérez Royo, Curso de Derecho Constitucional, 9na ed., Madrid, Ed. Marcial Pons, 2003, pág. 637. En la práctica, sin embargo, este referéndum sí tiene efectos decisivos en los órganos representativos del cuerpo electoral, pero “para al *821 canzar virtualidad jurídica los resultados de la consulta tendrán que ser ratificados formalmente por el correspondiente órgano del Estado ...”. íd.

 El Art. VII, Sec. 2, de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, ed. 1999, pág. 423, dispone, además, que “Q]a Asamblea Legislativa podrá, mediante resolución concurrente aprobada por dos terceras partes de los miembros de que se compone cada Cámara, consultar a electores capacitados si desean que se convoque a una convención constituyente para hacer una revisión de esta Constitución”. La Ley Núm. 477, sin embargo, no aprobó este método de consulta al pueblo como mecanismo para enmendar la Constitución.

 En el referéndum celebrado participó el 22.6% del electorado inscrito. De ese porcentaje de los electores, el 83.8% favoreció la unicameralidad.

 Según surge del trámite legislativo del P. del S. 2672, 14ta Asamblea Legislativa, 7ma Sesión Ordinaria, 26 de marzo de 2004, éste no obtuvo el voto afirmativo de dos terceras partes de los miembros que componen cada cámara. En la Cámara de Representantes el proyecto obtuvo el aval de veintinueve miembros, mientras que en la votación final ante el Senado, el proyecto enmendado obtuvo el voto afirmativo de diecisiete miembros de dicho cuerpo. Véase el trámite de aprobación del P. del S. Núm. 2672 (2004), disponible en Oficina de Servicios Legislativos, www.oslpr.org (última visita, 22 de junio de 2007).

 De igual modo, no arguyen los demandantes recurrentes que la Asamblea Legislativa inició dicho procedimiento constitucional de enmienda. Por el contrario, aducen que la Decimoquinta Asamblea Legislativa del Estado Libre Asociado está obligada a seguir el mandato electoral del pueblo que se expresó a favor de la unicameralidad en un referéndum válido, convocado mediante estatuto por la Decimocuarta Asamblea Legislativa.

 Véase Newton v. Commissioners., 100 U.S. 548, 10 Otto 548 (1879). El professor Laurence Tribe indica en este respecto:
“Similarly, the power of Congress legislatively to bind subsequent Congresses is limited, for any statute that purported to direct certain things or follow certain procedures could be repealed, as could any other law, by smother law, by another duly enacted statute. ... This prospect, along with other concerns, calls into question the constitutional propriety, not merely the practical efficacy, of any attempt to supplement, or subtract from, what the Constitution requires for a law to be validly enacted.” L.H. Tribe, American Constitutional Law, 3era ed., Nueva York, Ed. Foundation Press, 2000, Vol. I, pág. 125 esc. 1.

 Elio, salvo circunstancias excepcionales que no están presentes en este caso. Por ejemplo, no podemos olvidar que “en ningún caso podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior”. 31 L.P.R.A. sec. 3. Véase, además, Consejo Titulares v. Williams Hospitality, 168 D.P.R. 101 (2006). Además, según el Art. II, Sec. 7, de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, la Asamblea Legislativa no podrá aprobar leyes que menoscaben obligaciones contractuales. Véanse, además: Bayrón Toro v. Sierra, 119 D.P.R. 605, 619-620 (1987); Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 394-397 (1973).